MARILYN LEMMON,                          )
DANIEL LEMMON,                           )
                                         )
        Plaintiffs,                      )
                                         )
        vs.                              )          Case No. 4:04CV01302 ERW
                                         )
WYETH, LLC, et al.,                      )
                                         )
        Defendants.                      )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment

[ECF No. 70], Defendants' Motion to Exclude the Causation Testimony of Elizabeth Naftalis,

MD [ECF No. 76], and Defendants' Motion to Exclude Testimony of Plaintiffs' Experts Drs.

Parisian, Blume, Austin, and Patsner [ECF No. 74].

## I.    BACKGROUND FACTS[1]

Plaintiffs Marilyn Lemmon and Daniel Lemmon filed a complaint, alleging personal

injury caused by Defendants' prescription hormone replacement therapy (HRT)[2].

HRT consists of pharmaceutical products comprised of estrogen and progestin, and is

prescribed to treat symptoms of menopause.  After their ovaries stop producing estrogen, some

---

[1]The Court's recitation of facts comes from those shown to be undisputed by the parties' responses to allegations contained in the amended Complaint, Defendants' Statement of Uncontroverted Material Facts and Plaintiff's Statement of Material Facts, and from unrefuted exhibits in the record [ECF Nos. 34, 37, 38, 71, 82, 101].  Facts regarding the history of HRT, the Defendants' roles in that history, and the information available concerning HRT and HRT side effects additionally can be found in the Eighth Circuit's opinion concerning one of the individual "bellwether" trials conducted by the MDL court, *In re Prempro Prod. Liab. Litig.*, 586 F.3d 547 (8th Cir. 2009).

[2]In their pleadings, the parties use "HT" when referring to their pharmaceutical hormone products.

women develop moderate to severe menopausal symptoms, including episodes of heat and sweating referred to as "hot flashes," and vaginal atrophy.

Premarin and Prempro are prescription products containing conjugated equine estrogen that have been approved by the Food and Drug Administration ("FDA") to treat menopausal symptoms and to prevent osteoporosis. Provera is a prescription product containing medroxyprogesterone acetate ("MPA") that has been approved by the FDA to reduce the incidence of endometrial cancer in postmenopausal women who have not undergone a hysterectomy and are receiving conjugated estrogen. Prior to 1995, Wyeth began developing a combination of estrogen and progestin, Prempro and Premphase, which are prescription products containing this combination.

Defendants Wyeth, LLC f/k/a Wyeth d/b/a Wyeth, Inc., and Wyeth Pharmaceuticals, Inc. (collectively referred to as "Wyeth") introduced Premarin in 1942. Defendant Upjohn Company launched Provera in 1959. By the 1970s, studies revealed a link between estrogen replacement drugs and endometrial cancer, and the FDA instructed Wyeth to change Premarin's label to warn consumers of the risk of endometrial cancer in 1975. After subsequent research indicated that prescribing progestin in combination with estrogen reduced the cancer risk, this combination hormone therapy became the standard of care. In 1994, Wyeth introduced Prempro, the first pharmaceutical combining estrogen and progestin in a single tablet.

During the relevant time, Wyeth researched, tested, manufactured, marketed, distributed, and sold Premarin, Prempro, and Premphase. Wyeth also manufactured, distributed, marketed and sold Cycrin, a form of MPA. Wyeth defendants are now subsidiaries of Pfizer, Inc. ("Pfizer"). A predecessor of Pfizer's subsidiary, Pharmacia, and Upjohn Company LLC,

(hereinafter referred to as "Upjohn") researched, tested, manufactured, marketed, and sold Provera.

The medical community became concerned regarding a possible connection between estrogens and breast cancer by 1976. In a June 14, 1976 internal memo, Wyeth physicians reported valid concern regarding the use of exogenous estrogen's role in increasing the incidence of breast cancer, but ultimately concluded that the use did not appear to do so. When informed that study findings indicating that estrogens might be a risk factor for breast cancer, possibly doubling the risk for women taking HRT for fifteen years or more, would be published in the *New England Journal of Medicine*, Wyeth circulated internal correspondence stating that it was crucial to formulate a plan "to either forestall or mitigate the possible adverse effects" of the study, and indicating concern that the study might impact Premarin's labeling requirements. Although a case-control study was considered, no such study was conducted.

Between the late 1980s and the early 1990s, additional studies linked HRT to an increased risk of breast cancer. Upjohn also was aware of the growing evidence indicating that HRT increased the risk of breast cancer, but did not pursue any studies to determine whether it did. A confidential Wyeth memorandum dated June 2, 1995, which was proposed to counter the publication of results of a recent Nurses' Health Study indicating that HRT caused breast cancer and increased mortality, stated: "Our recommended strategies are: Undermine/cast doubt on validity of data by raising concerns, via credible third party, regarding such issues as: inclusion criteria (e.g., exclusion of alcoholic beverage consumers) . . .issue of statistical power . . . communicate estrogen's benefits in osteoporosis, heart disease[.]"

Between 1991 and 1996, Premarin's label and patient information sheet stated, "[t]he majority of studies have shown no association with the usual doses used for estrogen replacement

therapy and breast cancer. Some studies have suggested a possible increased incidence of breast cancer in those women taking estrogens for prolonged periods of time and especially if higher doses are used."

Between 1987 and 1997, Premarin's warning included the following language:

Estrogens can cause development of other tumors in animals, such as tumors of the breast, cervix, vagina, or liver, when given for a long time. At present there is no good evidence that women using estrogen in menopause have an increased risk of such tumors, but there is no way yet to be sure they do not; and one study raises the possibility that use of estrogens in the menopause may increase the risk of breast cancer many years later.

Prempro's 1996 label stated:

Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens. However, some studies have reported that breast cancer developed more often (up to twice the usual rate) in women who used estrogens for long periods of time (especially more than 10 years), or who used higher doses for shorter times periods. The effects of added progestin on the risk of breast cancer are unknown. Some studies have reported a somewhat increased risk, even higher than the possible risk associated with estrogens alone. Others have not.

Prempro's label in 1997 stated:

Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years. The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy. The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combined estrogen/progestin therapy has been reported. Other studies have not shown this relationship.

Premphase's 1998 label contained similar language, as did Premarin's and Prempro's 1999 labels. The HRT drugs' labels now carry a "black box"[3] warning for breast cancer.

---

[3]A "black box" warning, advising health professionals of the risks and precautions associated with a prescription drug, is the most serious type of warning required by the FDA in prescription drug labeling.

In 1991, the National Institute of Health's ("NIH") Women's Health Initiative Study ("WHI") was initiated, and one of its study components proposed to evaluate the use of estrogen and progestin in postmenopausal women. However, on July 9, 2002, the National Heart, Lung and Blood Institute, a division of the NIH, announced it was terminating the estrogen plus progestin study component due to an unacceptably high incidence of invasive breast cancer among the participants. The initial results of this study were published in the *Journal of the American Medical Association* in July 2002, and included the conclusion that the overall health risks exceeded cardiovascular benefits from use of combined estrogen plus progestin for an average 5.2 year follow-up among healthy postmenopausal women.

Prior to starting HRT, Plaintiff Marilyn Lemmon (hereafter, the singular designation of "Plaintiff" shall refer to Marilyn Lemmon only) suffered from hot flashes. Between March 1987 and October 1999, several physicians, including Dr. Robert Stockwood, Dr. Marla Tobin, and Dr. Stephanie Long, prescribed Premarin, Provera, Prempro, and MPA for Plaintiff. Initially, Plaintiff's gynecologist, Dr. Stockwood, prescribed Premarin and Provera for Plaintiff. Plaintiff's family physicians, Dr. Tobin and Dr. Long, prescribed Premarin, Provera, and MPA for Plaintiff between 1991 and October 1999.

In October of 1999, Plaintiff was diagnosed with infiltrating lobular carcinoma of the left breast. Pathology testing revealed that Plaintiff's cancer was estrogen and progesterone receptor-positive. Thereafter, Plaintiff underwent surgery, radiation, chemotherapy, and adjuvant anti-hormonal medication therapy. Plaintiff required additional treatment when she was diagnosed with lymphedema of the left arm in 2000.

## II. PROCEDURAL BACKGROUND

On or about September 24, 2004, Plaintiffs filed a complaint against Defendants Wyeth; Upjohn a/k/a Pharmacia & Upjohn, Inc.; Pfizer; and Greenstone LLC ("Greenstone"); for personal injury caused by Defendants' prescription HRT [ECF No. 1].

Plaintiff's action was subsequently transferred to by the Judicial Panel on Multidistrict Litigation (JPML) to the HRT multidistrict litigation (MDL) proceeding (*In Re: Prempro Products Liability Litigation*) pending in the Eastern District of Arkansas before the Honorable William R. Wilson, Jr. [ECF No. 14]. In January of 2011, the MDL court advised the JPML that coordinated or consolidated pretrial proceedings in Plaintiff's action had been completed, and that remand to this Court was appropriate [ECF Nos. 18, 19, 20].

Thereafter, Plaintiff filed an amended complaint containing fifteen claims[4] [ECF No. 34]. Defendants filed their answers to Plaintiff's amended complaint, asserting several affirmative defenses, including the application of comment k of § 402A of the Restatement (Second) of Torts [ECF Nos. 37, 38]. Subsequently, Defendants filed their summary judgment motion, as well as several motions to exclude testimony of Plaintiff's experts, with memoranda in support of their motions [ECF Nos. 66, 68, 72, 74, 76].

## III. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The United States

---

[4]Count XV of the Amended Complaint states a claim for loss of consortium; however, Plaintiffs have agreed to voluntarily dismiss with prejudice any loss of consortium claim.

Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Assoc'd Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). To meet its burden, the non-moving party may not

rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party that would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## IV. ANALYSIS

Defendants present many arguments in their Motion, some which are applicable to all defendants, but others that pertain only to Defendants Pfizer and Greenstone. In their Motion, Defendants assert that all of Plaintiff's claims against Pfizer and Greenstone fail because Plaintiff cannot prove that she ingested a product manufactured or sold by Pfizer or Greenstone, and because there is "no basis in law or fact to impose liability on Pfizer based on Plaintiff's alleged use of Wyeth's Premarin and Prempro and Upjohn's Provera." The Court will analyze Pfizer's and Greenstone's asserted grounds for summary judgment before turning to the arguments pertinent to all Defendants.

Defendants maintain that Pfizer is not liable to Plaintiff, asserting that there is no "causal connection" or "causal relationship" between Greenstone or Pfizer and Plaintiff's injuries because there is no evidence in the record that Plaintiff ingested any HRT medications manufactured, distributed or sold by either company. In her response,[5] however, Plaintiff argues that the record demonstrates a genuine issue of fact as to whether Pfizer can be held liable for the

---

[5]In her Response, Plaintiff incorporates by reference the summary judgment response of the plaintiff in Hanrahan v. Wyeth, et al., 4:04CV01252 ERW, as a discussion and summarization of "Wyeth's and Upjohn's global conduct in negligently and recklessly failing to study and warn[.]"

debts and liabilities of Wyeth or Upjohn under the doctrine of successor liability (Count XIV of the amended complaint) due to Pfizer's purchase of Wyeth's and Upjohn's assets.

In its January 13, 2011 Amended MDL Pretrial Order for Remanded Cases and Second Suggestion of Remand designating this case and other cases as ripe for remand, the MDL court stated that the cases "should involve only allegations of breast cancer injury against only Defendants Wyeth and Upjohn." *In re Prempro Prods. Liability Litig.*, No. 03-1507, 2011 WL 124188 at *5 (E.D. Ark. Jan. 13, 2011). This Order indicated that, because the JPML had determined the MDL included all manufacturers of HRT, a process had been established to dismiss Defendants when a plaintiff could not supply some evidence of product identification. *Id*. at *5. The MDL court expressly designated this Pretrial Order, along with any supplements and amendments, as the Final Pretrial Order pertaining to the listed cases. *Id.* at *1.

Generally, under the doctrine of the law of the case, orders issued by a federal transferee court remain binding when the case is remanded to the transferor court. *Winter v. Novartis Pharm. Corp.*, No. 06-04049, 2011 WL 5008008 at *2 (W.D. Mo. Oct. 20, 2011). The doctrine of the law of the case provides that, when a court decides a rule of law, its decision "should govern the same issues in subsequent stages in the same case." *Id*. Thus, the doctrine precludes relitigation of matters already determined, "protecting the expectations of the parties, ensuring uniformity of decisions and promoting judicial efficiency." *Unigroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995). Although the doctrine is discretionary, allowing a court to depart from the law of the case if cogent or compelling reasons to do so are shown, courts are hesitant to disturb transferee court's rulings in MDL proceedings because "doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings." *Winter*, 2011 WL 5008008 at *2 (citation omitted); *Unigroup*, 45 F.3d at 1211.

Reasons warranting departure from the doctrine include a subsequent change in law, the availability of new evidence, or the need to correct a clear error or to prevent manifest injustice. *Duetsch v. Novartis Pharm. Corp.*, 768 F. Supp.2d 420, 428 (E.D.N.Y. 2011).

Plaintiff argues that the record demonstrates a geniune issue of fact as to whether Pfizer can be held liable for the debts and liabilities of Wyeth under the theories of express or implicit assumption of debts or liabilities, de facto merger, and continuation. Plaintiff's arguments do not provide compelling grounds to disturb the MDL ruling in the transferee court's Final Pretrial Order. The Court therefore concludes that Defendants Pfizer and Greenstone are entitled to summary judgment on Counts II, IV, VI and XIV of Plaintiff's Amended Complaint based on the law of the case, because Plaintiff cannot prove that she ingested a product manufactured or sold by Pfizer or Greenstone. Additionally, as Plaintiff has no factual or legal basis for imposing liability against Pfizer based on her use of Wyeth's or Upjohn's HRT drugs, Pfizer and Greenstone must be dismissed as defendants in this action.

In her Response in Opposition to Defendants' Motion for Summary Judgment [ECF No. 82, p. 5, n. 12], Plaintiff withdrew claims for fraud, breach of express warranty, and breach of implied warranty (denominated as Counts VII, VIII, IX, X, XI, and XII in the amended complaint). Consequently, Defendants' motion is denied as moot as to those claims, and the Court limits its discussion to the remaining counts, denominated in the complaint as Counts I-VI, XIII, and XIV: Count I, negligence (against Wyeth); Count II, negligence (against MPA Defendant Upjohn); Count III, Strict Product Liability (against Wyeth); Count IV, Strict Product Liability (against MPA Defendant Upjohn); Count V, Strict Product Liability - Failure to Warn (against Wyeth); Count VI, Strict Product Liability - Failure to Warn (against MPA Defendant Upjohn); Count XIII, Joint Ventures, Parent/Subsidiaries, and/or Successor Corporation Liability

(against Wyeth); and Count XIV, Joint Ventures, Parent/Subsidiaries, and/or Successor

Corporation Liability (against MPA Defendant Upjohn).

In their remaining common grounds, Defendants argue that summary judgment should be

entered in their favor on Plaintiff's negligence and strict liability failure-to-warn claims (Counts

I, II, V and VI) because Plaintiff has no evidence that Defendants' warnings were inadequate or

that their alleged failure to warn caused her injuries.  Defendants further aver that summary

judgment is appropriate on Plaintiff's negligent preparation, research, development, inspection,

labeling, marketing, promotion and selling claims (Counts I and II) because such claims are not

recognized causes of action under Missouri law.  They argue that Plaintiff's claims for negligent

design and strict products liability (Counts I, II, III, and IV) fail because she has not alleged any

specific defect in the design of Defendants' products and because Missouri courts have adopted

comment k[6] to Section 402A of the Restatement (Second) of Torts.  Defendants also challenge

---

[6]Comment k to Section 402A of the Restatement (Second) of Torts provides:

There are some products which, in the present state of human knowledge, are quite incapable of
being made safe for their intended and ordinary use.  These are especially common in the field of
drugs.  An outstanding example is the vaccine for the Pasteur treatment of rabies, which not
uncommonly leads to very serious and damaging consequences when it is injected.  Since the
disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine
are fully justified, notwithstanding the unavoidable high degree of risk which they involve.  Such
a product, properly prepared, and accompanied by proper directions and warning, is not
defective, nor is it unreasonably dangerous.  The same is true of many other drugs, vaccines, and
the like, many of which for this very reason cannot legally be sold except to physicians, or under
the prescription of a physician.  It is also true in particular of many new or experimental drugs as
to which, because of lack of time and opportunity for sufficient medical experience, there can be
no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is
justifies the marketing and use of the drug notwithstanding a medically recognizable risk.  The
seller of such products, again with the qualification that they are properly prepared and marketed,
and proper warning is given, where the situation calls for it, is not to be held to strict liability for
unfortunate consequences attending their use, merely because he has undertaken to supply the
public with an apparently useful and desirable product, attended with a known but apparently
reasonable risk.

any claim for manufacturing defect; however, Plaintiff specifically states she is not pressing any claim for manufacturing defect (*see Defendants' Motion* at 2; *Plaintiff's Response* at 26, n. 74). Consequently, Defendants' argument on this point is moot.

### A.    The Record Presents a Genuine Issue of Material Fact as to Whether the HRT Drugs Prescribed for Plaintiff Caused Her to Develop Breast Cancer

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because Plaintiff cannot prove that, "but for" a defect in Defendants' products, she would not have been harmed.  In order to prevail on negligence and strict liability claims under Missouri law, Plaintiff must establish a causal connection between the defendants' conduct and the resulting injury.  *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 991 (8th Cir. 1998).  To establish this necessary connection, Plaintiff must prove both proximate causation, and causation in fact, often referred to as "but for" causation.  *Id.*

In their argument, Defendants assert that Plaintiff relies "entirely on the testimony of her only case-specific expert, Dr. Elizabeth Naftalis, to support her allegation that HT caused her breast cancer."  Defendants further claim, incorporating by reference their Motion to Exclude [ECF Nos. 76, 77], that Dr. Naftalis's opinions are inadmissible under Federal Rules of Evidence 401, 402 and 702, and that without Dr. Naftalis's testimony, Plaintiff will be unable to establish the requisite causal link between HRT and Plaintiff's alleged injury.  Consequently, this Court must first address Defendants' challenge to Plaintiff's expert witness on specific causation in order to determine whether Plaintiff has made a showing sufficient to establish the existence of an essential element of her action.  *See Celotex*, 477 U.S. at 322-23.

In their Motion to Exclude Dr. Naftalis's causation testimony, Defendants attack the expert's use of "differential diagnosis" to draw the conclusion that Plaintiff would not have developed breast cancer had she not taken HRT medications.  Defendants argue that Dr.

Naftalis's differential diagnosis methodology is unreliable because it has not been validated in medical and scientific communities. They further assert that Dr. Naftalis does not reliably apply her methodology.

An expert opinion rendered by a qualified individual offering sufficient factual basis for the opinion, forming the opinion on reliable principles and methods, and applying those principles and methods to the facts of the case, is admissible if the opinion "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The record clearly indicates that Dr. Naftalis, as a medical doctor specializing in the surgical evaluation and treatment of breast disease and breast cancer and as a former Director of Operations at the Surgical Breast Clinic at the University of Texas Southwestern, is qualified to render an expert opinion in this matter. Thus, the only task for the Court to assess here is whether the methodology used by Dr. Naftalis is valid and properly applied.

Differential diagnosis is a technique that identifies the cause of a medical condition by eliminating other possible causes until the most probable cause is isolated. *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000). As noted by Plaintiff and acknowledged by Defendants, the Eighth Circuit already has held that differential diagnosis is an accepted methodology for determining the cause of some diseases, including breast cancer. *Id.*; *Scroggin v. Wyeth*, 586 F.3d 547, 566-67 (8th Cir. 2009). The Eighth Circuit's determination that such methodology is valid leaves only the question as to whether Dr. Naftalis properly applied the methodology to the facts of Plaintiff's case.

In challenging Dr. Naftalis's application of her methodology as unreliable, Defendants argue that Dr. Naftalis fails to "rule in," or even consider, Plaintiff's family history of breast cancer; that this expert cannot "rule out" Plaintiff's endogenous hormones as a cause of her

cancer; and that she fails to account for the possibility unknown factors caused Plaintiff's cancer. Defendants made similar contentions regarding Dr. Naftalis's testimony in *Scroggin*, claiming that differential diagnosis cannot be used to prove the cause of breast cancer because no one knows the cause of breast cancer, that Dr. Naftalis was not familiar with the plaintiff's family history of breast cancer until trial, and that this expert did not properly account for the plaintiff's various risk factors, such as breast density, age, weight, and smoking history. *Id.*

Defendants' argument that Dr. Naftalis's testimony should not have been admitted because the plaintiff had some breast cancer risk factors and a family history of breast cancer failed to persuade the Eighth Circuit. *Id.* This Court likewise finds Defendants' contentions unpersuasive in this case. Defendants' challenges to Dr. Naftalis's testimony go to the weight, not admissibility of the proposed opinion; any weaknesses in the doctor's testimony can be properly exposed through vigorous cross-examination and the presentation of contrary evidence. *Id.* at 566-67. Defendants' Motion to Exclude the Causation Testimony of Elizabeth Naftalis, MD [ECF No. 76], will be denied.

Accordingly, the record contains admissible expert testimony sufficient to establish the existence of the requisite causal link between HRT and Plaintiff's alleged injuries, and presents a genuine issue of material fact as to whether the HRT drugs prescribed for Plaintiff cause her to develop breast cancer.

B.     **The Record Presents a Genuine Issue of Material Fact as to Whether Defendants' Warnings Were Inadequate and as to Whether the Alleged Failure to Warn Caused Plaintiff's Injuries**

Defendants argue that summary judgment should be entered in their favor on Plaintiff's negligence and strict liability failure-to-warn claims (Counts I, II, V and VI) because Plaintiff has

no evidence that Defendants' warnings were inadequate, or that Defendants' alleged failure to warn caused her injuries.

To prevail on a negligent failure-to-warn claim, Plaintiff must prove that Defendants manufactured or designed the HRT drug; that the HRT drug did not contain an adequate warning of its alleged defect or hazard; that Defendants failed to use ordinary care to warn of the risk of harm from the alleged defect or hazard; and that, as result of such failure, Plaintiff sustained damage. *Moore v. Ford Motor Co.*, 332 S.W3d 749, 764 (Mo. 2011).

To recover under the theory of strict failure-to-warn liability, Plaintiff must prove that the HRT drug was unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics; that Defendants did not give an adequate warning of the danger; that the product was used in a manner reasonably anticipated; and that Plaintiff was damaged as a direct result of the HRT drug being sold without an adequate warning. *Pollard v. Ashby*, 793 S.W.2d 394, 397-98 (Mo. App. E.D. 1990). Admissible expert testimony that additional or other warnings might have altered the plaintiff's behavior is required in failure-to-warn cases. *See Bryant v. Laiko Int'l Co., Inc.*, No. 05-00161, 2006 WL 2788520 at ** 9-10 (E.D. Mo. Sept. 26, 2006); *Davidson v. Besser Co.*, 70 F. Supp.2d 1020, 1023 (E.D. Mo. 1999).

In the memorandum submitted in support of their Motion, Defendants claim that summary judgment in their favor on Plaintiff's negligence and strict liability failure-to-warn claims is appropriate because Plaintiff has no admissible evidence from an expert-of-fact witness regarding the adequacy of the warnings Defendants placed on Premarin, Provera, and Prempro.

Defendants acknowledge that Plaintiff has designated several experts, including Dr. Cheryl Blume and Dr. Suzanne Parisian, to testify regarding the adequacy of Defendants'

warnings. Nevertheless, Defendants maintain that the opinions of these experts are "inherently unreliable and are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1995)." In making their argument, Defendants incorporate by reference a Motion to Exclude the testimony of these experts[7] and their supporting memorandum, which Defendants filed concurrently with their summary judgment motion [ECF Nos. 74, 75, 100]. Defendants further argue in their Reply in Support of their Motion to Exclude that, because this expert testimony suggests "that Wyeth *should have* done certain things to study Prempro," the testimony "appeals to *some standard*," and is therefore inappropriate due to the lack of an objectively verifiable reference for the standard of care for pharmaceutical testing (italics in original) [ECF. No. 100].

Rule 702 mandates a policy of liberal admissibility, and expert testimony is permitted if it will assist the trier of fact in understanding the evidence or to determine a fact in issue. Fed. R. Evid. 702; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). To be admitted under Rule 702, proposed expert testimony must meet three prerequisites: 1) any evidence based on scientific, technical or other specialized knowledge must be useful to the fact finder in determining a fact in issue; 2) the proposed witness must be qualified to assist the fact finder;

_____

[7]Defendants also challenge the admissibility of testimony by Dr. Donald F. Austin regarding a claim that Defendants failed to adequately test their HRT products prior to marketing them. Plaintiff indicates that she does not intend to elicit testimony from Dr. Austin regarding whether Defendants failed to test, failed to warn, or acted reasonably. Rather, Plaintiff states that Dr. Austin will opine on the types of testing and study available to pharmaceutical companies during the relevant time. Consequently, Defendants' motion is moot as to Dr. Austin on the warning adequacy issue. The Court further notes that, although Defendants' Motion to Exclude requests the Court to exclude the testimony of Dr. Bruce Patsner also, their Motion for Summary Judgment and supporting memorandum do not include argument addressing this expert, or challenging the admissibility of his testimony.

and 3) the proposed evidence must be reliable or trustworthy in an evidentiary sense.  *Id.;*

*Daubert*, 509 U.S. at 590-93.

As to the qualifications of the proposed witnesses to assist the finder of fact in this matter, the Court notes that Dr. Parisian is a medical doctor and a former Chief Medical Officer at the FDA.[8]  Dr. Blume, president of a consulting firm specializing in pharmaceutical development and registration activities, has a doctoral degree in pharmacology and toxicology, and enjoyed a long career as a pharmaceutical company executive whose responsibilities included overseeing preclinical and clinical programs associated with pharmaceutical product development, securing FDA approval of prescription drugs and revising drug labels as needed.

Concerning the usefulness of the proposed evidence, Plaintiff states that Dr. Parisian and Dr. Blume will testify regarding the inaccuracy and inadequacy of Defendants' product labeling. They further assert that the testimony of Dr. Parisian and Dr. Blume will be used to "explain complex, technical subjects to the jury, including the process of drug development, the procedures involved in FDA approval, the limitations on FDA review of drug applications and post approval activities and, significantly, the meaning of specialized terminology appearing in Defendants' documents."  Given the nature of the proceeding and the issues presented, the Court finds both proffered expert witnesses to be qualified to assist the finder of fact regarding the adequacy of the defendants' product labeling.

Defendants argue that the opinions of these experts regarding the adequacy of the label warnings are unreliable because the opinions  are not based on a reliable methodology or any objective standard of care.  As previously discussed in this Court's disposition of the defendants'

---

[8]*See Daniel v. Wyeth Pharm., Inc.*, 15 A.3d 909, 926 (Pa. 2011); *Kendall v. Wyeth, Inc.*; Nos. 936-2010, 937-2010, 1154-2020; 2012 WL 112609 at **5-6 (Pa. Super. Jan. 3, 2012).

challenge to Dr. Naftalis's testimony, a district court's goal in assessing expert testimony is to ensure that "all scientific testimony is both reliable and relevant." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)). The reliability requirement means that "the party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid," while the relevance requirement demands "the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Id.* (internal quotations and citations omitted).

Rule 702's requirements notwithstanding, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758. This is because the Rule "only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal citation omitted). As such, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Id.* at 1100-01. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1995).

Defendants' Motion to Exclude as to these two experts and their proposed testimony regarding the adequacy of Defendants' warnings will be denied. These witnesses have specialized knowledge of the regulatory procedures, pharmaceutical labeling, FDA standards and

practice, governmental statutes and regulations, pharmaceutical industry customs and practices, administrative rules, internal policies, and other factors that can assist the trier of fact in determining the adequacy of Defendants' label warnings. Defendants' challenge to the testimony of these experts again goes more to the weight, rather than the admissibility, of the evidence.

Although Defendants' summary judgment motion does not challenge the qualifications of Dr. Donald F. Austin, MD, or Bruce Patsner, MD, on this point, Defendants' Motion to Exclude does request that the testimony of these two experts be excluded, Dr. Patsner's in its entirety, and Dr. Austin's to the extent it concerns Defendants' alleged failure to test their HRT products. In the interest of judicial efficiency and economy, the Court shall address Defendants' *Daubert* challenge regarding these two experts.

Concerning Dr. Austin, Defendants appear to concede that he is qualified, as an epidemiologist, to interpret epidemiologic research and state opinions about the relationship between HRT and breast cancer. However, as stated above, Defendants do challenge the admissibility of his opinions concerning any failure to test by Defendants. In response, Plaintiff states that she does not intend to elicit any testimony from Dr. Austin regarding whether Defendants failed to test, failed to warn, or acted unreasonably. Rather, Plaintiff indicates that Dr. Austin will opine as to the types of testing and studying that were available to a pharmaceutical company during the relevant time frame. As Defendants do not challenge the propriety of such testimony, Defendants' motion will be denied as moot as it concerns Dr. Austin.

As to Dr. Patsner, Defendants argue in their Motion to Exclude that his failure-to-warn opinion is inadmissible because it is not based on a reliable methodology. Dr. Patsner, currently a health law and bioethics professor, is a retired gynecologic oncology physician and a former

FDA medical officer. The Court finds that, like Drs. Parisian and Blume, Dr. Patsner is qualified, based on his training and experience, to testify with respect to adequacy of Defendants' product labeling, and that he has specialized knowledge that can assist the trier of fact in determining the reasonableness of a pharmaceutical company's conduct. Again, Defendants' arguments go to the weight, rather than admissibility of this expert testimony. Defendants' Motion to Exclude Opinions of Plaintiffs' Experts Drs. Parisian, Blume, Austin and Patsner [ECF No. 74] will be denied.

The record contains admissible expert testimony regarding the warnings Defendants placed on their pharmaceutical products, and the Court finds that it presents a genuine issue of material fact as to whether the Defendants' warnings were inadequate.

Defendants further argue that, under the learned intermediary doctrine, no alleged failure to warn by Defendants could have been the proximate cause of Plaintiff's injuries. Defendants claim that the record clearly establishes that Plaintiff's prescribing physicians were fully aware of the risk of breast cancer associated with HRT when they prescribed those medications for her, and Defendants argue that, due to her physicians' awareness, no alleged failure to warn by Defendants could have been the proximate cause of Plaintiff's injury. Defendants further aver that Plaintiff cannot establish that an adequate warning would have altered her physicians' decisions to prescribe the medications. Consequently, Defendants assert that Plaintiff has no evidence that Defendants' alleged failure to warn caused Plaintiff's injuries.

It is incumbent upon drug manufacturers to provide physicians with adequate warnings of the risks associated with their prescription products. *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419-420 (Mo. App. E.D. 1999). A corollary to this rule is the learned intermediary doctrine, which recognizes the role of a physician as a "learned intermediary" between a drug

manufacturer and a patient, and provides that a manufacturer's failure to provide a prescribing physician with an adequate warning is not the proximate cause of a patient's injury, if the prescriber had independent knowledge of the risk an adequate warning would have communicated. *Id*. at 420.

The Court concludes that the record demonstrates a genuine issue of fact as to whether Plaintiff's physicians fully knew of the breast cancer risk posed by the HRT medication regimen they prescribed for her. One of Plaintiff's prescribers, Dr. Stockwood, testified that "for a long time . . . the PremPro was the -- the drug of choice at that time. I -- I switched my opinion of that and went to straight estrogen and then followed with progesterone on a --." [ECF No. 82-1 at 65]. Dr. Stockwood stated that, prior to the mid 1990s, he did not believe progesterone had any adverse effects, and that he thought that estrogen only slightly increased risk for breast cancer [ECF No. 82-1 at 68-69]. He further testified that he believed HRT supplied a cardiac benefit and would prevent heart disease and osteoporosis [ECF No. 82-1 at 70-71, 83-84]. This physician testified that he would have changed his prescribing habits and patient discussion regarding the risks and benefits of HRT if he had received new information regarding breast cancer risk, or had learned that HRT did not provide cardiovascular benefits. [ECF No. 82-1 at 84, 86, 88, 89, 94].

Another one of Plaintiff's prescribers, Dr. Tobin, testified that in the 1990s, her understanding was that the majority of studies showed no breast cancer risk [ECF No. 82-2 at 39]. She further stated that the message she received from results released about the WHI study was that HRT should be monitored, and should consist of lower doses and shorter usage; she indicated that she would be more conservative in her approach to HRT than she had been in the 1990s [ECF No. 82-2 at 28]. She testified that her counseling regarding HRT and the risk of

breast cancer and her prescribing approach would probably be different today, in light of the WHI findings, and subsequent information and studies [ECF No. 82-2 at 43].

Dr. Long also testified that, prior to the WHI study findings, she thought HRT provided heart and mental benefits, and that this thought was considered as part of her entire assessment of HRT risks and benefits [ECF no. 82-2 at 96]. She stated that her discussion of risks and benefits has changed since the WHI study [ECF No. 82-2 at 101].

Defendants further argue that Plaintiff cannot establish that a different warning would have altered the decisions of Plaintiff's physicians to prescribe HRT medication for her. However, Missouri aids plaintiffs in proving that a warning would have altered the behavior of their prescribing physicians by presuming that a warning will be heeded. *Arnold v. Ingersoll-Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992). There is a rebuttable presumption that arises as a matter of law. *Grady v. Am. Optical Corp.*, 702 S.W.2d 911, 918 (Mo. App. E.D. 1985). Moreover, the record contains evidence indicating that Plaintiff's doctors did alter their prescribing practices after the results of the WHI study were published indicating increased breast cancer risk with HRT. Having found no compelling evidence submitted by Defendants establishing that Plaintiff's prescribing physicians would not have heeded an adequate warning, the Court concludes that the causation issue is a question for the finder of fact. Thus, Defendants have not established a right to judgment on this issue.

### C.  Summary judgment is not appropriate as to the claims contained in Counts I and II because Missouri recognizes causes of action alleged in these counts.

Defendants argue that Plaintiff's negligence claims should be dismissed as a matter of law, stating that they fail as a matter of law because Missouri does not recognize causes of action for claims contained in Counts I and II of Plaintiff's complaint. Defendants aver that Counts I and II assert causes of action for: 1) negligent marketing, promotion and sale; 2) negligent

testing, research and development; and 3) negligent manufacturing. The Court need not address Defendant's argument concerning any negligent manufacturing claim, because Plaintiff specifically states in her Response that she is "not pressing any claim for manufacturing defects, so Defendants' argument on that point is moot."

Concerning Defendants' challenge to Counts I and II on the basis that these counts assert causes of action that Missouri does not recognize, the Court finds that Counts I and II sufficiently state negligent failure-to-warn claims, and that Plaintiff's marketing and testing allegations are aspects of their failure-to-warn claims. *See Moore*, 332 S.W.3d at 764 (stating elements of failure-to-warn claim based in negligence). As negligent failure to warn is a cause of action recognized by Missouri courts, the Court concludes that Plaintiff's negligence claims should not be dismissed as a matter of law. Further, the Court holds summary judgment is not appropriate as to Counts I or II of Plaintiff's complaint on the basis urged by Defendants.

> **D.** **Plaintiff's Claims for Negligent Design and Strict Liability (Counts I, II, III and IV) Do Not Fail Due to any Lack of Proof of a Design Defect, and Comment k to Section 402A of Restatement (Second) of Torts Does Not Preclude Plaintiff's Strict Liability Claims**

Defendants assert that Plaintiff's design defect claims should be dismissed as a matter of law, and that Plaintiff's causes of action for negligent and strict liability fail because Plaintiff cannot prove a defect in the design of Premarin, Provera, or Prempro.

Because design defect and failure-to-warn theories are distinct theories protecting consumers from dangers that arise in different ways, a finding of a product defect is not a necessary predicate to a failure-to-warn action. *Moore*, 332 S.W.3d at 756. The Court's determination that Counts I and II of Plaintiff's complaint sufficiently state negligent failure-to-warn claims precludes dismissal of these counts as a matter of law.

However, Counts III and IV of Plaintiff's complaint do assert strict product liability claims against Defendants, alleging that the HRT drugs "were defective in design or formulation in that, when they left the hands of [Defendants], the foreseeable risks exceeded the benefits associated with the design or formulation." [ECF No. 34 at 31, 32]. Plaintiff alternatively alleges that the design or formulation of the drugs were defective, "in that when they left the hands of [Defendants], they were unreasonably dangerous and more dangerous than an ordinary consumer would expect." [ECF No. 34 at 31, 32]. Plaintiff further alleges that the drugs were defective "due to inadequate warning and/or inadequate clinical trials, testing, and study, and inadequate reporting regarding the results of it." [ECF No. 34 at 31, 32].

Defendants argue that Plaintiff's design defect claims should be dismissed as a matter of law because Plaintiff cannot prove a defect specific to the design of the HRT drugs, and because comment k to Section 402A of the Restatement (Second) of Torts prohibits Plaintiff's strict liability design defect claim.

Section 402A states the strict-liability rule for sellers of products that cause physical harm to their users or consumers, imposing liability on sellers of "any product in a defective condition unreasonably dangerous" where the seller is engaged in the business of selling the product and the product is expected to and does reach the user or consumer substantially unchanged from its original condition when sold. Restatement (2d) Torts § 402A. The terminology of the Restatement's language indicates that a product's defect need not be "a matter of errors in manufacture," and that the product is defective "*when it is not accompanied by adequate instructions and warning of the dangers attending its use*." *Hill v. Searle Lab.*, 884 F.2d 1064, 1067 (8th. Cir. 1989) (italics in original). Here, Plaintiff's proposed evidence includes admissible expert testimony supporting her allegations that the HRT drugs were defective due to

24

inadequate warning, clinical trials, testing, study, and reporting. The Court finds that Plaintiff has offered sufficient evidence to support a finding that Defendants' HRT drugs were in a defective condition unreasonably dangerous when they reached Plaintiff. Thus, Plaintiff's design defect claims do not fail due to lack of proof of a design defect.

Nevertheless, comment K to Section 402A of the Restatement (Second) of Torts does provide manufacturers of prescription products with an exception to strict liability upon a showing that the products fall within its scope. Accordingly, the Court must determine whether the evidence shows that comment K applies to Defendants' HRT prescription products.

Comment k to Section 402A of the Restatement (Second) of Torts addresses the application of strict liability to unavoidably unsafe products such as prescription medication, imposing liability on a drug manufacturer only if it failed to warn of dangerous propensities that it either knew or should have known. *Pollard*, 793 S.W.2d at 398-99; *see also Restatement (Second) Torts § 402A, comment k* ("[t]he seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use"). Missouri courts have determined that the comment's terms indicate comment k does not apply to cases involving manufacturing defects or inadequate warnings. *Pollard*, 793 S.W.2d at 400. Therefore, although comment k would not apply to the strict liability failure-to-warn claims contained in Counts V and VI of Plaintiff's complaint, it could provide Defendants with an exception to strict liability as to the claims alleged in Counts III and IV, upon a showing that the HRT products fall within the comment's scope.

In cases where a design defect is alleged, Missouri courts have limited the application of comment k to "drugs shown to be incapable of being made safe given the present state of human

knowledge but which have such a high degree of social need that their use is warranted, so long as there are sufficient warnings." *Id*. at 399-400.

The application of comment k is an affirmative defense. *Id*. at 400. Thus, the manufacturer bears the burden of establishing that a drug falls within the realm of comment k protection. *Id*. To meet this burden, the manufacturer must establish two requirements. *Id*. First, the manufacturer must show that the drug's risk is unavoidable, "by demonstrating that, given the current state of knowledge, no feasible alternative design exists that would accomplish the same purpose with a lesser risk." *Id*. Next, the manufacturer must demonstrate that the drug's overall benefits outweigh the risks it presents to individual safety. *Id*. This prong is a balancing test, with the weighing performed at the time the product was distributed to the plaintiff. *Id*.

Although Defendants raised comment K as an affirmative defense in their answer, they have not established either of the comment's requirements. Defendants' summary judgment argument regarding this affirmative defense begins by stating that Plaintiff cannot establish that their products are unreasonably dangerous because comment K specifically recognizes that prescription drugs such as their HRT products are not unreasonably dangerous. Defendants then state that comment K expressly recognizes that imposing strict liability on manufacturers of "unavoidably unsafe" products such as their HRT drugs is improper. Without any further discussion or analysis, Defendants state, in a conclusory manner, that comment k applies to this case because "the products at issue are incapable of being rendered non-dangerous but provide benefits to society that outweigh their attendant risks." Defendants have not offered or directed the Court's attention to evidence showing that their HRT products are unavoidably unsafe, nor to evidence establishing their drugs' societal benefits. The Court finds that Defendants have not

met their burden of establishing that comment k excludes their HRT products from strict liability; thus, summary judgment in their favor is not appropriate on this asserted basis.

### 2. Plaintiff's Failure-to-Warn Claims Are Not Barred by the Learned Intermediary Doctrine

Manufacturers of prescription drugs have a duty to warn physicians properly of the risks involved with a prescription product, and "it is incumbent upon the manufacturer to bring the warning home to the doctor." *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d at 419.

A corollary to this rule is the "learned intermediary doctrine," which deems any warning given to a physician as being a warning to his patient *Id*. Under this doctrine, the failure of a drug manufacturer to provide a physician with an adequate warning of the risks associated with a prescription product is not the proximate cause of his patient's injury if the prescribing physician had independent knowledge of the risk that should have been communicated. *Id*. at 420. However, Missouri courts have adopted a "heeding presumption," which assumes that doctors will perform non-negligently when presented with an adequate warning; consequently, in the absence of compelling evidence establishing that the absence of a warning did not cause the injury, the causation question becomes one for the jury. *Moore*, 332 S.W.3d at 762-63; *Grady*, 702 S.W.2d at 918.

Although conflicting, the evidence on proximate causation is sufficient to survive summary judgment on Plaintiff's failure-to-warn claims. Some of Plaintiff's prescribing physicians testified that they still prescribe estrogen plus progestin to menopausal women; however, noted, they also testified that they have changed their prescription practices since the results of the WHI study became commonly known. Consequently, Plaintiff produced sufficient evidence to preclude a grant of summary judgment on these claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Exclude Testimony of Plaintiffs' Experts [ECF No. 74] and Defendants' Motion to Exclude the Causation Testimony of Elizabeth Naftalis [ECF No. 76] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [ECF No. 70] is **GRANTED, in part, and DENIED, in part**.  Defendants' Motion for Summary Judgment is **GRANTED**, as to Defendants Pfizer and Greenstone only, on Counts II, IV, VI and XIV of Plaintiff's Amended Complaint.  **IT IS FURTHER ORDERED** that Defendant Pfizer and Defendant Greenstone are hereby **DISMISSED** as defendants in this matter.

**IT IS FURTHER ORDERED** that, as to all defendants except Pfizer Greenstone, Defendants' Motion for Summary Judgment is **DENIED** as to Counts I, II, III, IV, V, VI, XIII, and XIV.

Dated this __11th__ day of July, 2012.

_E. Richard Webber_
_____
E. RICHARD WEBBER
 SENIOR UNITED STATES DISTRICT JUDGE